# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE,<br>          Plaintiff,<br><br>     v.<br><br><br>UNITED STATES FOREST SERVICE,<br>et al.,<br>                    Defendants. | Case No. 2:12-cv-00004-REB<br><br>**MEMORANDUM DECISION AND ORDER ON SUMMARY JUDGMENT MOTIONS** |

## INTRODUCTION

Pending before the Court are cross motions for summary judgment (Dkts. 23 & 28), asserting legal issues appropriate for resolution on summary judgment. After an earlier hearing upon the motions, the Court stayed the case to wait for the U.S. Supreme Court's decision on review of a Ninth Circuit Court of Appeals case involving a standing issue similar to this case, *Pacific Rivers Council v. U.S. Forest Service*, 689 F.3d 1012 (9th Cir. 2012). *See U.S. Forest Service, et al. v. Pacific Rivers Council, et al.*, No. 12-623, 133 S.Ct. 1582, 2013 WL 1091766 (U.S. Mar. 18, 2013). On June 17, 2013, the Supreme Court vacated the opinion by the United States Court of Appeals for the Ninth Circuit, and in remanding the case, directed the district court to dismiss it as moot in its

entirety.  *U.S. Forest Service v. Pacific Rivers Council*, 133 S.Ct. 2843, 2013 WL

2922118 (U.S. Jun 17, 2013).  *See also Pacific Rivers Council v. U.S. Forest Service*, 724

F.3d 1146, 1147 (9th Cir. 2013).  Accordingly, the stay is lifted and the Court now enters

the following Order granting ICL's Motion for Summary Judgment and denying

Defendants' cross-motion.

## BACKGROUND[1]

Plaintiff Idaho Conservation League ("ICL") challenges a decision made by the

U.S. Forest Service and supervisors Mary Farnsworth and Maggie Pittman (collectively

"the Forest Service") for a timber and fire management project ("Project") in the Fern

Hardy Resource Area ("Fern Hardy"), located in the Coeur d'Alene River Ranger District

in the Idaho Panhandle National Forests (the "Panhandle").  ICL seeks declaratory relief

(1) stating that the Forest Service failed to comply with the environmental review

requirements of the Healthy Forest Restoration Act, and (2) "an injunction prohibiting

road building, timber extraction, and fire management activities until the Forest Service

complies with the law."  Pl.'s Mem., p. 1 (Dkt. 23-1).

ICL argues that the Project will affect a number of terrestrial and aquatic

ecosystems and species.  Pl.'s Mem., p. 2 (Dkt. 23-1).  The planned activities include

commercial timber harvest, prescribed burning, fuel breaks, vegetation management, road

---

[1]  The parties included more background information in their briefing, but the
Court states here only the facts necessary to decide the issues at hand.

construction, road improvement and reconditioning, and road maintenance.[2]  PI-75, EA[3], p. 2-2.  These activities will occur on 2,493 acres of the 13,200 acre Fern Hardy area.  PI 75, p. 2-2.  The management plan for the Project emerged because conditions in the Fern Hardy create a risk of uncontrolled fires that threaten homes, infrastructure (such as roads and power lines), and natural resources.  EA, pp. 3-2, 3-8.

The Healthy Forest Restoration Act ("HFRA") was enacted in 2003 to "reduce wildfire risk to communities, municipal water supplies, and other at-risk federal land" by "[a]s soon as practicable" implementing "authorized hazardous fuel reduction projects." 16 U.S.C. §§ 6501(1), 6512(a).  In pursuit of that goal, in April 2011 the Forest Service developed an Environmental Assessment for the Project in the Fern Hardy.  EA, p. 1-3. That assessment describes the Fern Hardy's location as close to home sites, private lands, the  I-90 freeway corridor, and other community infrastructure.  PI-75, EA, p. 1-3.  The Forest Service explained in the assessment that a severe wildfire in the area could result in loss of lives, structures, and private land values, in addition to a loss of environmental

---

[2]  The proposed action alternative in the Environmental Assessment calls for the Forest Service to: conduct prescribed burning of surface fuels like grass, brush, and small conifers, EA at pp. 2-6 to 2-8; harvest timber to reduce the potential for fires and to increase overall resistance to insects and disease, *id.* at 2-2 to 2-6; reforest 505 acres, *id.* at 2-6; and construct fuel breaks through noncommercial thinning and pruning to reduce surface and ladder fuels and to diminish the possibilities of fire near homes, structures, private property, and access routes; and to give firefighters a space that they can defend from wildfire, *id.* at 2-8.

[3]  "EA" refers to the Environmental Assessment from April 2011.

**MEMORANDUM DECISION AND ORDER - 3**

values such as forest cover, wildlife habitat, soil productivity, water quality, timber value, and scenic quality. *Id.*

In the EA, the Forest Service states that its management plan for the Fern Hardy Project was based on three objectives – to reduce hazardous fuels, develop sustainable forest conditions, and restore and retain key ecosystem components. PI-75, EA, p. 1-3. The Forest Service identified two alternatives for the Project in the EA: (1) take no action or (2) or implement a plan that includes vegetation and road management. PI-75, EA, p. 2-2. The Forest Service's road management plan includes building temporary and permanent roads, and reconstructing, reconditioning, maintaining, and decommissioning roads. The vegetation management plan includes commercial timber harvesting, prescribed burns, fuel break development, and tree planting. PI-75, EA, p. 2-2. The Fern Hardy Project is farther than 1.5 miles of the boundary of an at risk community. PI-PF-81, p. D-7.

ICL contends in its pending motion that insufficient action alternatives were considered by the Forest Service in creating the Fern Hardy Environmental Assessment. The Forest Service takes the opposition position in making its own motion, and also challenges ICL's standing to bring this case. Accordingly, the Court decides here: (1) whether ICL has standing to pursue this case, (2) whether the Forest Service was required to include and analyze a second action alterative in the Fern Hardy Environmental Assessment, and, if so, (3) whether the Forest Service adequately considered a second action alternative.

## THE FOREST SERVICE'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Forest Service requests summary judgment in its favor on all issues raised by ICL, but also asserts that ICL lacks standing to pursue this case. Because a ruling in favor of the Forest Service on the standing issue would obviate the need to rule on other matters, the Court first will decide the question of ICL's standing.

### A. Evidence Considered in Determining Whether ICL has Standing

The parties disagree about whether Julie Dalsaso's declaration in support of ICL's standing was timely submitted. The Dalsaso Declaration was filed with Plaintiff's reply brief on May 3, 2012. The Case Management Order ("CMO"), however, contains a March 15, 2012 deadline to file "declarations or other evidence in support of [ICL's] Article III standing." (Dkt. 24, p. 2).

ICL contends that the parties' stipulation, presented to the Court in support of the CMO, was not intended to foreclose additional evidence. ICL submitted an email exchange between counsel in which ICL's counsel committed to file the "standing" declarations by March 15th. However, ICL qualified its intentions, saying that if "the Forest Service raises standing arguments in its brief, we reserve our rights. . . to introduce additional evidence related to standing." Regan Declr., Ex. B-1, p. 1 (Dkt. 33-3).

Accordingly, there is an open question as to whether the parties had agreed there would be no objection to a later-raised piece of evidence on standing. Of significance, the Forest Service could have rejected ICL's qualified position, but did not do so and in the context, its silence is the equivalent of assent. Even so, because Plaintiff's reply brief

also was intended to serve as a brief in response to the Forest Service's Cross-Motion for Summary Judgment, the Dalsaso Declaration was timely filed as an affidavit supporting ICL's response to the Forest Service's motion, which first raised the standing issue. *See* D. Idaho L. Civ. R. 7.1(c)(1) (providing that the "responding party shall serve and file with the response brief any affidavits, declarations[,] . . . and other supporting materials on which the responding party intends to rely"). For these reasons, the Court will consider the Dalsaso Declaration on the standing issue.

**B.    Standards of Law**

Article III of the United States Constitution limits judicial power to deciding cases and controversies. The standing doctrine requires a plaintiff to allege "a personal stake in the outcome of the controversy . . . to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 442 U.S. 490, 498-99 (1975). A plaintiff must establish that:

> he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013). *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S.Ct. 1142, 1149 (2009). The burden, of course, is upon ICL to demonstrate its standing to pursue its claims. *Summers*, 555 U.S. at 493.

The concrete harm requirement can be satisfied by an injury to "the recreational or even the mere esthetic interests of the plaintiff." *Summers*, 555 U.S. 493. The Ninth Circuit has recognized that such an injury can be found in the testimony of a member of an environmental group that he or she "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Further, "[w]here the recreational use of a particular area has been extensive and in close proximity to the plaintiff, an affiant's expressed intention to continue using the land is sufficiently concrete to underwrite an injury-in-fact." *Jayne*, 706 F.3d 994, 999 (9th Cir. 2013) (citation and internal quotation marks omitted). The nexus is not entirely without shape, however, as "a vague desire to return to the area 'without any description of concrete plans, or indeed any specification of when the some day will be' does not support a finding of actual or imminent injury." *Id.*

## C.     ICL has Established the Injury and Causation Elements of Standing

The Forest Service argues that ICL lacks standing because it "has failed to draw any link between the Forest Service's alleged failure to consider an additional alternative and any likely future injury." Cross-Mot. Summ. J., p. 10 (Dkt. 28-1). The template for such an analysis drawn by the Supreme Court in *Summers* provides that "[w]hile generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that

will suffice." *Summers*, 555 U.S. at 494. Additionally, ICL "need not establish causation

with the degree of certainty that would be required for [it] to succeed on the merits, say,

of a tort claim. Rather, [it] need only establish "the 'reasonable probability' of the

challenged action's threat to [its] concrete interest." *Hall v. Norton*, 266 F.3d 969, 977

(9th Cir. 2001) (citation and internal quotation marks omitted); *see also Center for Food

Safety v. Vilsack*, 636 F.3d 1166, 1171–72 (9th Cir. 2011) (using the "reasonably

probable" standard). The Ninth Circuit, after *Summers*, addressed the issue in this

manner:

> [Plaintiffs] err in suggesting that *Summers* rejected the 'reasonable
> probability' standard. In *Summers*, the Supreme Court stated that to
> seek injunctive relief, plaintiffs must be "under threat of suffering
> 'injury in fact' that is concrete and particularized; the threat must be
> actual and imminent." 129 S.Ct. at 1149. Yet, *Summers* reaffirmed
> the unique nature of procedural injuries—namely, that a plaintiff
> seeking to enforce procedures that protect his concrete interests may
> do so "without meeting all the normal standards for redressability
> and immediacy." 129 S.Ct. at 1151 (quoting *Lujan v. Defenders of
> Wildlife*, 504 U.S. 555, 572 n. 7, 112 S.Ct. 2130, 119 L.Ed.2d 351
> (1992)); *see also Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130
> (explaining that "one living adjacent to the site for proposed
> construction of a federally licensed dam has standing to challenge
> the licensing agency's failure to prepare an [EIS], even though he
> cannot establish with any certainty that the statement will cause the
> license to be withheld or altered, and even though the dam will not
> be completed for many years"). The "reasonable probability"
> standard derives from that principle, *see Citizens for Better Forestry*,
> 341 F.3d at 972, which *Summers* left unchanged, *see, e.g., Friends of
> Tims Ford v. TVA*, 585 F.3d 955, 968 (6th Cir. 2009) (applying
> "reasonable probability" standard post- *Summers* ).

*Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1171–72 n.6 (9th Cir. 2011). *See also

Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1076–78 (9th Cir. 2012) (explaining

that *Summers* "does not support reconsideration of our prior decision," in part because "[t]his is not a case where the plaintiffs have no plan to use the land in question") (citation and internal quotation marks omitted).

Here, information placed in the record by ICL suggests that the alleged failure by the Forest Service to consider other action alternatives may cause harm to ICL members' interests. Brad Smith says he has been harmed because the Forest Service did not consider an alternative to use existing logging roads and spare old growth forest stands from logging. Smith Declr., ¶ 21 (Dkt. 21). His declaration describes a visit to the Fern Hardy and the signs of logging that he asserts will reduce his enjoyment of being in the forest. *Id*. at ¶ 18. Irving Paul says similarly that he is aware of the consequences of logging and road building in the Idaho Panhandle National Forest and that these activities have reduced his enjoyment of the outdoors. Irving Declr., p. 4 (Dkt. 22).

The Court is satisfied that these statements of Mr. Paul and Mr. Smith can be evidence of possible harm. However, to assert a concrete interest sufficient to demonstrate the injury element of standing, the plaintiff organization must show more than a "general intention" of its members to return to a national forest. *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010). *See, e.g.*, *Central Sierra Env'tl Res. Ctr. v. U.S. Forest Service*, No. S–10–2172 KJM–AC, 2013 WL 77499, *4-5 (E.D.Cal. Jan. 4, 2013) ("[e]nvironmental groups do not have standing to challenge actions that affect only certain geographical areas when the groups do not set forth facts showing that their members have aesthetic and environmental interests in those particular areas, as

opposed to broader areas . . . [b]ut the members' declarations in this case list specific

roads and trails and areas they plan to visit that will be affected by the [challenged

project]").  To sustain standing on the basis of aesthetic and recreational injury, it would

be sufficient to show that plaintiff had "repeatedly visited an area affected by a project,

that he had concrete plans to do so again, and that his recreational or aesthetic interests

would be harmed if the project went forward . . . .  [A] vague desire to return to the area

without any description of concrete plans, or indeed any specification of when the some

day will be does not support a finding of actual or imminent injury."  *Wilderness Soc.,*

*Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (quotations omitted).

    The Smith and Paul declarations may not demonstrate an extensive use of the Fern

Hardy area, but both contain assertions made under oath of at least one past visit to the

area and future intentions to use or view the Fern Hardy and surrounding areas in a

variety of ways.  *See* Smith Declr., ¶¶ 18–19; Paul Declr., ¶¶ 5, 7, 9, 16.  Ms. Dalsaso's

declaration is yet stronger in that regard, as she states with more particularity that she has

visited the Fern Hardy and has plans to return to that area again.[4]  Dalsaso Declr., ¶ 5

---

    [4] "[E]nvironmental plaintiffs must allege that they will suffer harm by virtue of
their geographic proximity to and use of areas that will be affected by the [Government's]
policy."  *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 341 F.3d 961, 971 (9th
Cir. 2003).  This situation is different than that in *Clapper v. Amnesty Intern. USA,* 133
S.Ct. 1138 (2013).  The question in *Clapper* was whether respondents have Article III
standing to seek prospective relief when they there is a "reasonable likelihood that their
communications will be acquired . . . at some point in the future."  *Id.* at 1142.  This
"theory of future injury" was found "too speculative to satisfy the well-established
requirement that threatened injury must be 'certainly impending.'"  *Id.*

(Dkt. 29-1). She too avers that she has "seen the effects" of logging in the Idaho Panhandle National Forest generally. She expects that such activities in the Fern Hardy will have negative impacts similar to that she has seen elsewhere in the Panhandle, such as decreased water quality and decreased aesthetics from activities such as road building.[5] *Id.* at ¶ 6. *See also* Smith Declr., ¶ 14 (Dkt. 21) (Smith believes that "the project will result in timber harvest in approximately 14 acres of old growth forest" and "will result in the construction of temporary and permanent roads associated with logging").

In comparison, the regulation at issue in *Summers* affected only small and widely scattered parcels of land throughout the entire United States and the plaintiffs had not shown any realistic likelihood they would come into contact *with the impacted areas*. Here, the ICL members who submitted declarations live near and recreate in the Panhandle. Dalsaso has regularly recreated in the Fern Hardy and "plan[s] on returning *to that area.*" *Id.* at ¶ 5 (emphasis added).

Further, the Government Defendants conceded in the *Summers* case that an affidavit was sufficient to establish standing as to a particular project (the Burnt Ridge Project), where the plaintiff organization's member stated he had repeatedly visited the

---

[5] *See, e.g.*, *Idaho Conservation League v. Atlanta Gold Corp.*, 844 F.Supp.2d 1116, 1128-29, 2012 WL 38633, *8-9 (D.Idaho Jan. 9, 2012) (describing sufficiency of ICL affidavits alleging actual injury from decision to avoid recreating in the area because of the environmental problems caused by agency action/inaction). *See also, e.g.*, *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001) (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (holding that plaintiff adequately established injury where individual testified that his recreational use of a lake was constrained by "fears of pollution from [the defendant's] permit exceedances")).

site, had imminent plans to do so again, and that his interests in viewing the flora and

fauna of the area would be harmed if the project went forward without incorporation of

the ideas he would have suggested to the Forest Service. *Summers*, 555 U.S. at 494.[6] The

declarations submitted by ICL contain assertions that if the project goes forward as

planned, without considering another action alternative, it will harm esthetic and

recreational interests of ICL members. Two of the declarants assert they will see the Fern

Hardy area and be in the surrounding areas, and one of declarants recites a future

intention to visit the Fern Hardy. Additionally, the central issue in *Summers* was whether

the plaintiff environmental groups had "standing to challenge the regulations *in the

absence of a live dispute over a concrete application* of those regulations." *Summers*, 555

U.S. at 490 (emphasis added). This case is not so inchoate as was the controversy in

*Summers* – rather, in this case the Forest Service has set forth a plan for the Panhandle

that includes destroying some vegetation, new logging, and constructing new roads.

Accordingly, ICL has sufficiently demonstrated the injury and causation elements

required for standing.

---

[6] The affidavit did not establish standing for the entire case. *Summers*, 555 U.S. at 494. Although the plaintiffs' case was initially tied to the Burnt Ridge Project, the district court entered a preliminary injunction related to that project, and the parties later settled that part of the dispute. *Summers*, 555 U.S. at 491. The Government then successfully argued to the district court that, "with the Burnt Ridge dispute settled, and with no other project before the court in which respondents were threatened with injury in fact, [the plaintiff environmental groups] lacked standing to challenge the regulations; and that absent a concrete dispute *over a particular project* a challenge to the regulations would not be ripe." *Id.* at 491-92 (emphasis added).

**D.      ICL Has Shown the Redressability of its Asserted Injury**

The Forest Service also contests an additional element of standing, arguing that ICL cannot "show that a favorable resolution will likely remedy any threatened injury from the [alleged] legal violation."  Cross-Mot. Summ. J., p. 1 (Dkt. 28-1).  There is, to be sure, testimony in the various declarations relevant to that question.  For instance, Mr. Smith believes he has been harmed because the Forest Service did not consider an action alternative that included using existing logging roads and sparing old growth forest stands from logging.  Smith Declr., ¶ 21 (Dkt. 21).  Mr. Smith says that ICL had suggested that the Forest Service consider an action alternative that would use existing logging roads and spare old growth forest stands from logging.  Smith Declr., ¶ 21.  Mr. Paul avers that ICL members are concerned that the "ultimate project is more harmful to Forest resources than is necessary for accomplishing the Forest Service's goals," hence their belief that the Forest Service should consider another alternative to its proposed action.  Paul Declr. ¶ 19 (Dkt. 22).  And, each of the declarants describes the effects of logging on water quality, increased number of and/or use of roads, and decreased enjoyment of the scenery.  Paul Declr., ¶¶ 11, 13-15; Smith Declr, ¶¶ 14-16; Dalsaso Declr., ¶¶ 6-7.  Although broadly stated, such alleged concerns (and the corollary proposition that such concerns would be avoided or alleviated if changes to the Project were made) are sufficiently certain to identify the fact of alleged harms and the protection from such injuries if the Plaintiff's recommendations were implemented in the Project planning.

Additionally, a procedural right afforded by Congress "can loosen the strictures of the redressability prong of our standing inquiry." *Summers*, 555 U.S. 496. In the *Summers* case, that loosening allowed "standing [to exist] with regard to the Burnt Ridge Project . . . despite the possibility that [the plaintiffs'] allegedly guaranteed right to comment would *not* be successful in persuading the Forest Service to avoid impairment of [the plaintiffs'] concrete interests." *Id.* at 497 (emphasis added). *See also Hall v. Norton*, 266 F.3d at 977 (explaining that a procedural right reduces the plaintiff's burden of proving redressability). Accordingly, even though ICL may not ultimately persuade the Forest Service to adopt any ICL proposed alternative action plan, ICL can still meet the redressability requirement for standing. *See Hall v. Norton*, 266 F.3d 969, 975 (9th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 & n. 7 (1992) ("In the case of a plaintiff 'seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of their's, the plaintiff can establish standing 'without meeting all the normal standards for redressability and immediacy.'")). ICL has done so here.

**E.      Conclusion:  ICL Has Standing in This Case**

The declarations submitted in this case identify the particular site tied to the challenged conduct and connect that to an alleged future injury ICL members seek to enjoin. *Compare Summers*, 555 U.S. at 495 (affiant for environmental group failed "to allege that any particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan of [the affiant's] to enjoy the

National Forests"); *id.* at 496 (although the affiant "does refer specifically to a series of projects in the Allegheny National Forest that are subject to the challenged regulations . . . [he] does not assert, however, any firm intention to visit their locations"). Accordingly, the Court finds a sufficient connection between the planned activities and the alleged harm to ICL members' interests for ICL to establish standing to pursue this case.

## ICL'S MOTION FOR SUMMARY JUDGMENT

ICL seeks summary judgment declaring that the Forest Service committed legal errors by (1) failing to consider the mandated minimum number of alternatives required by the Healthy Forest Restoration Act; and (2) misinterpreting the statutory minimum number of alternatives as an upper limit on the number of alternatives that the Forest Service may consider. Pl.'s Mem., p. 25 (Dkt. 23-1). ICL also seeks an injunction prohibiting road construction, timber extraction, and fire maintenance activities in the Fern Hardy until an additional action alternative is considered. *Id.*

The Forest Service seeks summary judgment on these issues and asks that the Court deny ICL's Motion for Summary Judgment.

## A. Statutory Framework

The Forest Service manages the National Forests pursuant to duties and obligations established under the Forest Service Organic Act of 1897, 16 U.S.C. §§ 472-482, 551, the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531, and the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600-1614. The Multi-Use Sustained-Yield Act of 1960 states that "[i]t is the policy of the Congress that

the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The NFMA also requires that the national forests shall be managed to "provide for multiple use and sustained yield of the products and services obtained there . . . and [must] include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness[.]" 16 U.S.C. § 1604(e)(1).

The National Environmental Policy Act ("NEPA") was enacted to ensure that the federal government makes major decisions significantly affecting the environment only after considering the impacts of those decisions and exploring possible alternatives. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1. NEPA establishes procedures to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed action in advance of a final decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA cases are reviewable under the Administrative Procedures Act ("APA"), 4 U.S.C. §§ 701-706. *Lujan v. Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990); *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003).

The Healthy Forests Restoration Act, 16 U.S.C. §§ 6501 *et seq*., directs the Forest Service, in a manner consistent with NEPA requirements, to take action to "reduce wildfire risk" and "enhance efforts to protect watersheds and address threats to forest and rangeland health." *Id.* §§ 6501(1), (3), 6514(a)(1). Specifically, the Forest Service is required "[a]s soon as practicable" to implement an "authorized hazardous fuel reduction

project[ ]" on federal land where "the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource." *Id.* § 6512(a)(4). HFRA requires the Forest Service to conduct fuel reduction projects in accord with NEPA and other applicable laws, except in certain circumstances not at issue here. 16 U.S.C. §6514(a). HFRA expedites normal notice and comment procedures, but still requires the Forest Service to prepare either an environmental impact statement or an environmental assessment for each hazardous fuel reduction project. *Decker v. U.S. Forest Serv.*, No. 09–cv–02675–PAB–CBS, 2011 WL 334451 (D. Colo. Jan. 31, 2011); 16 U.S.C. §6514(b).

## B.    Standard of Law

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In cases asserting NEPA and NFMA violations, the judicial review provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, apply. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). Under the APA, agency action may set aside only if it was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law" or was adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**C.     HFRA Sets the Minimum Number of Action Alternatives to Consider and the Forest Service Did Not Meet that Minimum**

Here, the Forest Service analyzed a no-action alternative and one action alternative in the Environmental Assessment ("EA").  ICL argues that the Forest Service should have considered an additional action alternative for the Fern Hardy Project.[7]  The Forest Service responds that HFRA did not require it to consider an additional action alternative and, even if it did, that was done during the scoping phase of project planning.  Both parties agree that a "no-action alternative" is not considered an "action alternative" under NEPA or HFRA.  Cross-Mot. Summ. J., p. 20, n.4 (Dkt. 28-1); Defs.' Reply, p. 8, n.1 (Dkt. 32).

   1.     *The number of action alternatives required*

The Fern Hardy Project is located within a wildland-urban interface.  At issue in this case are the following subsections of HFRA:

(c) Consideration of alternatives

(1) In general

_____

[7] *Compare Wildwest Institute v. Bull*, 468 F.Supp.2d 1234, 1240 (D.Mont. 2006) (describing that the Forest Service analyzed three alternatives for an HFRA project – a no action and two action alternatives); *Wildwest Institute v. Bull*, 547 F.3d 1162, 1166 (9th Cir. 2008) (explaining, in a background section not relevant to the holding of the case, that HFRA required the Forest Service "to 'study, develop, and describe the proposed agency action; the alternative of no action; and an additional action alternative,' if that alternative 'is proposed during scoping or the collaborative process . . . and meets the purpose and need of the project'", and noting that the Forest Service had "considered: (1) a no-action alternative ('Alternative 1'); (2) its preferred alternative ('Alternative 2'); and (3) an alternative proposed by [various conservation groups] ('Alternative 3') (quoting 16 U.S.C. § 6514(c)(1)).

Except as provided in subsection (d), in the environmental assessment or environmental impact statement prepared under subsection (b), the Secretary shall study, develop, and describe--

(A) the proposed agency action;
(B) the alternative of no action; and
(C) an additional action alternative, if the additional alternative--

(i) is proposed during scoping or the collaborative process under subsection (f); and
(ii) meets the purpose and need of the project, in accordance with regulations promulgated by the Council on Environmental Quality.

However, the statute also provides for an "[a]lternative analysis process for projects in wildland-urban interface." 16 U.S.C. § 6514(d)(1). For "an authorized hazardous fuel reduction project that is proposed to be conducted in the wildland-urban interface, the Secretary is *not* required to study, develop, or describe *more than* the proposed agency action and 1 action alternative *in the environmental assessment* or environmental impact statement." 16 U.S.C. § 6514(d)(1) (emphases added). This is in contrast to the situation in which "an authorized hazardous fuel reduction project proposed to be conducted in the wildland-urban interface is located no further than 1 ½ miles from the boundary of an at-risk community." 16 U.S.C. § 6514(d)(2). In that circumstance, "the Secretary is *not* required to study, develop, or describe *any* alternative to the proposed agency action *in the environmental assessment* or environmental impact statement prepared pursuant to [NEPA]." *Id.* (emphases added).

ICL challenges the environmental analysis the Forest Service conducted for areas within the wildland-urban interface, but more than 1.5 miles from an at-risk community. Compl. ¶¶ 78-83. The Forest Service agrees that subsection 6514(d)(1) applies to its responsibilities in that regard because the Fern Hardy "Project includes activities farther than 1.5 miles from the boundary of an at-risk community." Cross-Mot. Summ. J., pp. 17-18 n.3 (Dkt. 28-1) (citing DN-7[8]).

However, the Forest Service contends in this litigation that it can comply with HFRA and NEPA "either by analyzing the no-action alternative [and] one action alternative or by analyzing a no-action alternative and two action alternatives." *See*, *e.g.*, Defs.' Reply, p. 7 (Dkt. 32). ICL disagrees, arguing that subsection (d)(1) requires consideration of two action alternatives.

In interpreting a statute, the starting point is the plain language. *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011). The Court should "examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* However, "[i]f the plain meaning of the statute is unambiguous, that meaning is controlling and we need not examine legislative history as an aide to interpretation unless 'the legislative history clearly indicates that Congress meant something other than what it said.'" *Id.* (quoting *Carson Harbor Vill., Ltd. v. Unocal*

---

[8] "For areas within the [wildland urban interface] but farther than 1.5 miles of the boundary of an at-risk community [which is the situation with the Fern Hardy project], the Forest Service is not required to analyze **more than** the proposed action and one additional action alternative." PF-PI-81 at DN-7 (emphasis in original).

*Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc)).  Conversely, "[i]f the statutory language is ambiguous, then we consult legislative history." *Id.*  The Forest Service agrees that the pertinent statute "is unambiguous".  Cross-Mot. Summ. J., p. 19 (Dkt. 28-1)

The Court also finds the statute to be unambiguous, and therefore will draw upon its plain meaning.  HFRA is written to require fewer alternatives when planned activities are within 1.5 miles of an at risk community, because one purpose of the Act is to protect those communities from wildfires.  *See* 16 U.S.C. § 6514(d)(2) (providing that "if an authorized hazardous fuel reduction project proposed to be conducted in the wildland-urban interface is located no further than 1 ½ miles from the boundary of an at-risk community, the Secretary *is not required* to study, develop, or describe *any alternative to the proposed agency action* in the environmental assessment or environmental impact statement") (emphases added).  However, when the activities are outside of that area, as they are here, more must be considered.  The words "more than" as used in the sentence: "the Secretary is not required to study, develop, or describe more than the proposed agency action and 1 action alternative" set a minimum requirement which the Forest Service must meet, and which the Forest Service may (but is not required to) exceed.  There is no room for reading such a requirement in the alternative, as the Forest Service contends.  Thus, the Forest Service is required to consider at least two action alternatives, but need not consider more.  Any other interpretation of

Subsection 6514(d)(1) would render meaningless Subsection 6514(d)(2), which provides for a lesser requirement of considering only the proposed agency action.

Although HFRA incorporates NEPA, the requirements under HFRA about the number of alternatives the agency must consider differs from NEPA, which may require the Forest Service to analyze up to eight, nine, or ten alternatives. *See* Cross-Mot. Summ. J., pp. 16-17 (Dkt. 28-1) (collecting cases). HFRA's lesser requirements hasten the pace of notice and comment procedures so that projects can be put in place expeditiously to minimize wildfire risks.[9] Even so, although there is authority stating that NEPA "does not impose a numerical floor on alternatives to be considered," the plain reading of the HRFA does require a minimum number in some circumstances. *Compare Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("To the extent that Native Ecosystems is complaining that having only two final alternatives – no action and a preferred alternative – violates the regulatory scheme, a plain reading of the regulations dooms that argument. So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied.").

---

[9] There is an inescapable anomaly created by this lawsuit, where the Court is construing a Congressional act intended to expedite Forest Service decision-making in the setting of a lawsuit which by its very nature is often protracted and antithetical to any sort of expedited result, particularly in an overburdened judicial docket. However, the Forest Service concreted such a path by its interpretation of the relevant provisions of HFRA at issue in this case.

*2.      Whether the Forest Service Considered Two Action Alternatives*

The Forest Service argues in the alternative that even if it was required by HFRA

to consider two action alternatives, it met that requirement by "studying, developing, and

describing the Scoping Alternative in the EA."  Defs.' Reply, p. 10 (Dkt. 32).  "Scoping"

is the first phase of the NEPA process and the information that comes out of the scoping

phase is used to determine the scope of the environmental assessment.  *See* 40 CFR §

1502.9 ("Draft environmental impact statements shall be prepared in accordance with the

scope decided upon in the scoping process.").  The Forest Service argues that it should be

allowed to rely upon (or even be "credited" for) an additional action alternative on

information and analysis generated during the scoping process when it summarizes that

analysis in an environmental assessment.  Defs.' Reply, p. 10 (Dkt. 32).  The Forest

Service refers to the EA's discussion of the scoping process and revisions to the agency's

initial proposed action in this case as "the Scoping Alternative".

The EA does mention alternatives to the Forest Service's initial plan that were

considered during the scoping phase, and the EA includes statements reflecting the Forest

Service's changes to its initial plan.[10]  However, only two alternatives are identified in the

EA – the no-action alternative and the proposed action plan.  PI-75, EA, p. 2-2.

---

[10]  In addressing the comments ICL submitted during the scoping process, the EA
describes how the Forest Service modified its initial proposed action based on comments
made during the scoping process.  *See* PI-75, EA, p. 2-28.  Also in the EA is a section
titled "Alternatives Considered But Eliminated" and a chart on page 2-29 comparing the
activities proposed prior to and after the scoping process (which resulted in a reduction of
the planned activities).

**MEMORANDUM DECISION AND ORDER - 23**

Significantly, the EA states that only "[o]ne alternative to the Proposed Action was considered in detail, the No Action Alternative" and that "[t]his range of alternatives is consistent with the requirements under HFRA." EA, p. 2-1. Moreover, the Forest Service interpreted HFRA as dictating an upper limit on the number of alternatives it could and did consider.[11] As described above, however, the Forest Service is mistaken in its view that "this range of alternatives is consistent" with HFRA requirements. But, as a result, the Forest Service constructed the EA to analyze only the proposed action and the no-action alternative, without recognizing that it was authorized by the statute to analyze another action alternative or that there was a need to do so.

Although many agency decisions are entitled to deference, when a decision is based on an error of law the agency is not properly exercising its discretion.[12] That is the

_____

[11] *See, e.g.*, PF-PI-44, p. 4 (Regional Office Response to Jonathan Oppenheimer Objection: "[T]he Forest Service is not required to analyze more than the proposed action and one additional action alternative (Section 104(d)(1)). This section of HFRA is setting the upper limit for the number of alternatives required under HFRA."); PF-PI-81, Att. A, p. A-5 (Decision Notice: "Two alternatives were fully analyzed for disclosure in the EA: the No-Action Alternative (taking no action at this time and providing a baseline for comparative analysis of effects) and the Proposed-Action Alternative as modified (the agency's Selected Alternative). The range of alternatives is consistent with the requirements under HFRA. . . . [Subsection (d)(1)] of HFRA sets the upper limit for the number of alternatives required under HFRA.").

[12] Although the APA's arbitrary and capricious standard is deferential, an agency's decision may violate that standard if the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise." *Jones v. National Marine Fisheries Serv.*, 741

(continued...)

product of the Forest Service's actions in this case. The Forest Service could not properly exercise discretion in a setting where it viewed the statute as limiting it to consideration of only the no-action and proposed action alternatives. *See, e.g., Transitional Hospitals Corp. of Louisiana, Inc. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (finding that while the agency had discretion, the agency erroneously interpreted that law to find that it did not have discretion and this interpretation invalidated the decision because discretion must be exercised by someone who realizes she possesses it).

Additionally, HFRA requires that the alternatives be studied, developed, and described in the environmental assessment.[13] The EA identifies only that the Forest Service arrived at the final proposed action alternative. There is a short description of some of the changes made to the original plan through the scoping process, but the EA does not fully study or develop the "Scoping Alternative". In contrast, the EA does compare and contrast in detail the Forest Service's proposed action and the no action

---

[12](...continued)
F.3d 989, 996 (9th Cir. 2013) (internal quotations and citation omitted). *See also Yepes-Prado v. U.S. I.N.S.*, 10 F.3d 1363, 1366 (9th Cir. 1993) (explaining that "an error of law also constitutes an abuse of discretion").

[13] Both NEPA and HFRA contain the "study, develop, and describe" language. *Compare* 42 U.S.C. § 4332(E) *with* 16 U.S.C. § 6514.

alternative, including the environmental impacts of those two alternatives.[14]  *See Native*

*Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1245 (9th Cir. 2005) (quoting

40 C.F.R. § 1508.9(b) (2000) (explaining that NEPA requires "brief discussions of the

need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], [and] of *the*

*environmental impacts* of the proposed action and alternatives") (emphasis added)).

The Forest Service admits that "[b]ecause the modified Proposed Alternative had

evolved beyond the initial Scoping Alternative, the Forest Service did not analyze the

Scoping Alternative in detail."  Cross-Mot. Summ. J., p.7 (Dkt. 28-1) (citing DN-7).  But

the Forest Services argues that it was not required to consider "the Scoping Alternative"

in detail because "it provided no benefits beyond the Proposed [Action] Alternative" in

the EA.  Cross-Mot. Summ. J., p. 21 (Dkt. 28-1).  That argument falls short, as "NEPA

requires that alternatives . . . be given full and meaningful consideration."  *Native*

*Ecosystems Council*, 428 F.3d at 1245 (citation and internal quotation marks omitted).

---

[14] For example, in Chapter 3 of the EA (which considers "[e]nvironmental [c]onsequences"), the Forest Service compared only "Alternative 1—No Action" with "Alternative 2—Proposed Action."  EA at p. 2-2; *see also* EA at pp. 3-19 – 3-26 (contrasting effects related to fire and fuels under the no action and proposed action alternatives); *id.* at pp. 3-48 – 3-64 (contrasting effects related to forest health and vegetation under the no action and proposed action alternative); *id.* at pp. 3-98 – 3-104 (contrasting environmental effects related to aquatic resources and fisheries under the no action and proposed action alternative); *id.* at pp. 3-127 – 3-142 (contrasting environmental effects related to aquatic resources and fisheries under the no action and proposed action alternative); *id.* at pp. 3-161 – 3-219 (contrasting effects related to wildlife fisheries under the no action and proposed action alternative).  And, as ICL points out, the Forest Service similarly compared the no action and proposed action alternative for issues involving threatened, endangered, and sensitive plants; noxious weeds; and scenery.  *See id.* at Chapter 3.

It is correct, as the Forest Service describes, that "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS. In rejecting any alternatives, the agency must only include 'brief discussions of the need for the proposal, of alternatives required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.'" *Native Ecosystems Council*, 428 F.3d at 1246-47 (quoting 40 C.F.R. § 1508.9(b) (2000)). The EA here, however, did not discuss all or even most of the environmental impacts of the initial action alterative proposed in the scoping process (i.e., the "Scoping Alternative"). Instead, the "consideration" was upon the proposed action alternative, with a follow-up statement that only "one alternative to the Proposed Action was considered in detail, the No-Action Alternative". EA, p. 2-1. In that setting, it is inescapable that the Forest Service's consideration of the "Scoping Alternative's" effects by discussing some of the effects of the "Scoping Alterative" and noting some of the common and differing effects of the Scoping and Proposed Alternatives, however well intentioned, is not enough. *See, e.g.*, EA, pp. 2-28–2-30. Accordingly, this case is remanded for the Forest Service to properly consider an additional action alternative in the EA, understanding that it has discretion to do so. *See Alaska Trojan Partnership v. Gutierrez*, 425 F.3d 620, 633 (9th Cir. 2005) ("Generally, when an agency commits an error of law, this court remands to the agency to reconsider its decision as required by law.").

**ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)       Plaintiff's Motion for Summary Judgment (Dkt. 23) is **GRANTED** and Plaintiff is granted the declaratory relief requested, as set forth in the Judgment filed with this Memorandum Decision and Order.

2)       Defendant's Cross-Motion for Summary Judgment (Dkt. 28) is **DENIED**. This case is remanded to the Secretary of the Forest Service for actions consistent with this Order, and this case is CLOSED.

DATED:  **March 10, 2014**

Honorable Ronald E. Bush
U. S. Magistrate Judge